IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
July 28, 2020 Session

## LAJUAN HARBISON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 111381      Steven W. Sword,  Judge**

---

### No. E2019-01683-CCA-R3-PC

---

The Petitioner, Lajuan Harbison, appeals as of right from the Knox County Criminal Court's denial of his petitions for post-conviction relief and writ of error coram nobis, wherein he challenged his conviction for attempted second degree murder.  On appeal, the Petitioner asserts that he received the ineffective assistance of counsel because trial counsel failed to investigate and assert a claim of self-defense.  Relative to the error coram nobis petition, the Petitioner contends that the post-conviction court erred by finding that new evidence from the victim, who recanted his trial testimony and averred that he was the primary aggressor rather than the Petitioner, was not credible.  Following our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ. joined.

Gregory P. Isaacs and J. Franklin Ammons, Knoxville, Tennessee, for the appellant, Lajuan Harbison.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Charme P. Allen, District Attorney General; and TaKisha Fitzgerald and Philip Morton, Assistant District Attorneys General, for the Appellee, State of Tennessee.

### OPINION

FACTUAL BACKGROUND

*I.      Trial and Direct Appeal*

The Petitioner, Lajuan Harbison, was convicted by a Knox County jury of attempted second degree murder and employing a firearm during the commission of a dangerous

felony relative to a March 30, 2013 incident in which J.E.[1] ("the victim") was shot multiple times at a Knoxville apartment complex. State v. Lajuan Harbison, No. E2015-02170-CCA-R3-CD, 2016 WL 4925632, at *1 (Tenn. Crim. App. Sept. 14, 2016). The Petitioner received an effective sixteen-year sentence.

The factual basis for the Petitioner's convictions was summarized as follows on direct appeal. After the shooting occurred, four 911 callers were unable to describe the shooter or tell the operator the shooter's location. Harbison, 2016 WL 4925632, at *1. A recording of exchanges between police officers and police dispatch reflected that a suspect had run into an apartment unit, which had been secured, and that the suspect was described as a "black man nicknamed 'Jajuan'" who was wearing black clothing. Later, a police officer stated that he had taken a suspect into custody and that the suspect had a gun.

An unloaded .25-caliber Raven Arms handgun and eight .40-caliber Smith & Wesson cartridge casings were recovered at the crime scene. Harbison, 2016 WL 4925632, at *1. Multiple police witnesses confirmed at the trial that the victim sustained several gunshot wounds to his leg. The victim, who was eighteen years old at the time of the trial, testified that he was walking with a friend, J.M.,[2] through a breezeway after leaving another friend's apartment when the Petitioner appeared with a gun and shot him. Id. at *2. The victim was acquainted with the Petitioner because they were from the same neighborhood, and the Petitioner's mother had been the victim's teacher. The victim averred that he had no conflict with the Petitioner, that on the day of the shooting, the Petitioner said nothing to him, and that the victim and J.M. did nothing to provoke the Petitioner. After being shot twice in the leg, the victim fell to the ground and was unable to run away; he stated that the Petitioner walked into the apartment building. The victim said that he saw a light-skinned man with dreadlocks after he was shot.

The victim testified that in total, the Petitioner shot him five or six times; the victim underwent orthopedic surgery on his right ankle joint, and he experienced continuing numbness in his left leg. Harbison, 2016 WL 4925632, at *2. The victim identified the Petitioner in a photograph lineup. He denied knowing that J.M. was carrying a gun.

At trial, J.M. declined to identify the Petitioner as the shooter, claiming that he had an unclear view and that he ran away when the shooting began. Harbison, 2016 WL 4925632, at *2. J.M. acknowledged, however, that he had identified the Petitioner in a photograph lineup conducted after the shooting when he was handcuffed in the back of a

---

[1] The victim was a minor at the time of the shooting; it is the policy of this court to refer to minor victims of criminal offenses by their initials.

[2] J.M. was also a minor at the time of the shooting. We note that although all of the post-conviction pleadings and hearing transcript spell J.M.'s first name using the letter "G," the trial transcript reflects that his name begins with the letter "J."

police cruiser. J.M. did not recall seeing a light-skinned man with dreadlocks or speaking to his godfather about the shooter's identity. J.M. stated that he was intoxicated with Xanax and alcohol at the time of the photograph lineup, and he admitted to carrying a .25-caliber handgun on the day of the shooting.

Police officer Sean Ford testified that the audio and video recording system in his police cruiser recorded statements J.M. made to his godfather, which Officer Ford also overheard, and that J.M. identified the shooter as "Jajuan," "Juan," and "Lajuan." Harbison, 2016 WL 4925632, at *2. Police Investigator Amy Jinks conducted both photograph lineups and noted that J.M. was uncooperative. Id. at *3. However, she heard J.M. refer to the shooter as "Lajuan" before viewing the lineup. Investigator Jinks stated that the victim was cooperative and identified the Petitioner as the shooter. An expert witness in firearms identification testified that the .40-caliber cartridge casings were fired by the same gun, possibly a Smith & Wesson, and that no .40-caliber gun was recovered for comparison.

Relevant to the issues raised here, on direct appeal, the Petitioner challenged the sufficiency of the evidence, arguing that his identity was not proven beyond a reasonable doubt and that no gun or unfired bullets were recovered. Harbison, 2016 WL 4925632, at *3. This court concluded that the evidence was sufficient to support the convictions, noting that multiple witnesses described the victim's wounds as gunshot wounds and that the victim and J.M. both identified the Petitioner as the shooter. Id. at *4.

## II. Post-Conviction Proceedings[3]

On September 12, 2017, the Petitioner filed a timely petition for post-conviction relief, alleging multiple grounds of ineffective assistance of counsel. An amended post-conviction petition was filed on November 5, 2018, incorporating the grounds alleged in the original petition and adding a petition for writ of error coram nobis, alleging that the victim had decided to recant his trial testimony and would testify to having been the primary aggressor. A post-conviction hearing was held on August 19, 2019.

At the post-conviction hearing, trial counsel testified that between his licensure in 1994 and 2005, he had worked as an assistant district attorney and that since 2005, he had worked in criminal defense. Counsel stated that he had tried one or two felony cases as a prosecutor and between forty and fifty felony cases as a defense attorney. Counsel was appointed to the Petitioner's case; he noted that generally, he met with a client to discuss

---

[3] The Petitioner has abandoned the bulk of his allegations against trial counsel on appeal. Accordingly, we will recount only those facts from the post-conviction hearing which are relevant to the issues presented in this appeal.

the case, reviewed the discovery materials alone and with the client, and approached the prosecutor in hopes of negotiating a plea agreement. If those talks were not productive, counsel decided on a defense strategy for trial.

Trial counsel testified that he did not utilize an investigator in the Petitioner's case, and he denied that the Petitioner requested one. Counsel stated that his investigation consisted of speaking to the Petitioner between five and eight times and reviewing the discovery materials, including witness statements, photograph lineups, and "how [the Petitioner] was identified." When counsel returned to the jail to speak to the Petitioner about the evidence, the Petitioner told him "not to worry about it, that the victim would not appear for court and this case would get dismissed." Counsel warned the Petitioner that this "was not an effective strategy for this type of a case" and that they needed to develop a better defense strategy. The Petitioner responded that "this couldn't be an attempted first-degree murder case, because he had only shot the fellow in the leg." Counsel said that he assured the Petitioner that this was also not an effective defense but that they could argue he did not attempt to commit first degree murder.

Trial counsel testified that the witnesses "did not appear on occasion" and that counsel was unable to locate them. Although counsel stated that he was "sure that [he] looked to see where they were," including searching the court computer system to determine whether the witnesses had scheduled court dates or other "things going on in the system," he did not go to witnesses' homes or try to call them. Counsel acknowledged that the anticipated witnesses were listed in the indictment; however, he could not recall if their addresses and telephone numbers were similarly listed. Counsel ultimately spoke to no witnesses before trial.

Trial counsel denied that the Petitioner ever told him that the victim had pulled out a gun before the Petitioner shot him. Counsel agreed that he generally made notes in his client files. An undated page of handwritten notes on white paper was introduced as an exhibit; the notes were written in black ink in a cursive script. The notes contained several names; a summary of J.M.'s police interview; a note regarding an interview on June 13, 2013, which read "admits to Glock under bed being his .9 mm"; a reference to "[b]allistics to gun found in bedroom"; the name "Dejanette," a telephone number, and the statements "girl saw shooting. Saw vic with gun. Saw someone p/u vic's gun. Person in jail w/c picked up gun"; and a note reading "Ask – who is light skinned dreds . . . [illegible] what is his real name & his brother."

When asked to explain the note about Dejanette, trial counsel testified that the notes did not reflect his handwriting. At this point, there was some disagreement between trial counsel and post-conviction counsel regarding whether the Petitioner's file was shared with appellate counsel before it was sent to post-conviction counsel. Trial counsel's memory

-4-

on this point was unclear; the State objected; and the post-conviction court stated that trial counsel could not speculate about who may have written the notes.

Another page was entered as an exhibit and contained notes written in blue ink on yellow paper. The majority of the notes were printed in handwriting that trial counsel identified as his own; two lines at the bottom of the page were written in a distinct handwriting that did not resemble counsel's handwriting or the cursive handwriting. Counsel acknowledged that one of his notes contained two telephone numbers for someone named "Diamond Davis"; although he did not recall to whom this referred, he "assume[d]" that it was a family member counsel needed to contact about the Petitioner's court date or to arrange for the Petitioner to have clothing for the trial. The rest of counsel's notes read as follows: "1. 6th [A]mendment –interview [the victim] –affidavit from him[.] Prior statement —In court testimony –criminal history."[4] Counsel stated that according to his recollection, the Petitioner wanted him to obtain an affidavit from the victim Counsel did not know why he did not interview the victim, but he hypothesized that he could not find the victim, did not look for him, or did not believe the victim's statement would be useful. Counsel stated that he did not make any attempt to interview J.M., commenting that J.M. was not "more important" than any other witness. Counsel did not know to what he referred when he wrote "prior statement" or "criminal history" in his notes, but he said that all of the notes may have referred to the victim. Counsel was certain that he obtained "any sort of criminal history" the victim had.

Trial counsel testified that notations on the outside of the Petitioner's file folder referred to two plea offers conveyed by the State. The first offer was contingent on the Petitioner's testimony in an unrelated criminal case, in which the Petitioner was named as a co-defendant, and it involved a fifteen-year sentence at thirty percent service; the second offer was for an effective twenty-one-year sentence and was not contingent on his testifying. The Petitioner rejected both offers.

Trial counsel testified that additional notations on the outside of the folder were not in his handwriting; the post-conviction court commented that it would not consider the substance of the unidentified notes as evidence because counsel did not know how they came to be on the folder. As pertinent to this appeal, the notes read, "statutes on mutual combat," "statutes on self-defense," and "case law on mutual combat." The handwriting was in cursive and appeared to be similar to the writing on the undated notes.

Trial counsel testified that he did not write in cursive because his cursive script was illegible, and he denied that he directed anyone to write on the file folder. He noted that he had no employees at the time of the Petitioner's trial. Counsel said that the only time

---

[4] Each of the statements were on separate lines underneath what appeared to be the heading of "6th Amendment."

the folder would have been in someone else's possession was if the Petitioner's attorney in the unrelated criminal case, A. Philip Lomonaco,[5] took it with him when he visited the Petitioner to convey the joint plea offer; however, counsel expressed skepticism that Mr. Lomonaco would have taken counsel's file at all, and he did not specifically remember giving his file to Mr. Lomonaco. Counsel stated that generally, he did not do appellate work and that he would provide his file to appellate counsel. Counsel did not know who represented the Petitioner on appeal.[6]

Trial counsel did not recall whether the Petitioner initially denied having been present during the shooting, but he remembered "an issue about some fellow maybe with dreadlocks" who was allegedly involved. Counsel stated that he never explored a theory of self-defense during trial preparation because he "was never presented with any idea from" the Petitioner that he would be able to testify about having acted in self-defense. Counsel stated that he reviewed the police cruiser recordings alone and with the Petitioner. When asked whether the recordings contained J.M.'s statement that "his brother," the victim, had a firearm, counsel responded that a firearm was found "in the grass in the area where the shooting took place," that J.M.'s statements were difficult to understand in the recordings, and that counsel did not recall whether the gun mentioned in the recordings was attributed to the victim or J.M.

A police cruiser recording was entered as an exhibit and reflected conversation between unidentified officers and J.M. Although portions of the conversation were difficult to understand, relevant to counsel's testimony and the issues on appeal, J.M. stated multiple times that his brother was carrying a gun. J.M. also said that he put on his brother's jacket while they were visiting an apartment because he was not sure if other individuals were "still riding around shooting." J.M. stated that he and his brother had done nothing to provoke the shooting. J.M. referred to officers' having found his brother's gun and denied knowing the identity of the shooter.

An audio recording of J.M.'s brief police interview with Investigator Jinks was entered as an exhibit and reflected that J.M. identified the shooter as "Jajuan." J.M. stated that he and the victim were coming around a corner when the Petitioner emerged from a building, greeted them, and opened fire. J.M.'s remaining responses to questions were generally not audible; however, Investigator Jinks indicated in the recording that J.M. did not know the reason the Petitioner shot the victim and that the Petitioner was in a gang,

---

[5] Mr. Lomonaco represented the Petitioner at trial in Knox County case number 101406D. See State v. Lajuan Harbison, No. E2015-00700-CCA-R3-CD, 2016 WL 4414723 (Tenn. Crim. App. Aug. 18, 2016), reversed by State v. Harbison, 539 S.W.3d 149 (Tenn. 2018).

[6] The record reflects that Leslie M. Jeffress represented the Petitioner in his direct appeal.

although J.M. would not name the gang. This interview also contained conversation indicating that Investigator Jinks was administering a photograph lineup.

Trial counsel testified that the police cruiser recording was not played for the jury and that he did not remember whether he cross-examined Investigator Jinks about J.M.'s statement that his brother had a firearm.[7] After reviewing the trial transcript, counsel acknowledged that he did not cross-examine J.M. about the statement and only asked J.M. questions about the .25-caliber gun, which belonged to J.M. Counsel noted that "only one other gun" was "ever mentioned."

Trial counsel agreed that if the victim had been carrying a gun, it would have raised a self-defense issue that should have been explored. Counsel maintained, however, that the police cruiser recording only reflected J.M.'s admitting to having carried the .25-caliber gun. Counsel agreed that the victim was J.M.'s brother and that the recording reflected J.M.'s stating, "My brother had a . . . gun on him." When asked whether this statement was a sufficient basis to "explore self-defense," counsel responded, "Except for the fact that there was only one gun and nobody left the scene, and [J.M.] admitted that he had it." Counsel agreed that he did not ask the victim if he had a gun.

When asked whether it was possible he did not review the police cruiser recording, trial counsel explained that the importance of the recording at trial was to explain the circumstances under which J.M. completed the photograph lineup and the "confusion" regarding the Petitioner's name.[8] Counsel stated that if the Petitioner had ever told him that he saw a gun or that a gun was pointed at him, counsel would have investigated a theory of self-defense. Although counsel did not recall asking the Petitioner about the gun found in the grass at the crime scene, he was "sure" he had done so.

Trial counsel testified that relative to opening and closing arguments, he "assume[d]" he argued "a mix of identity and being overcharged." After the motion for a new trial was denied, counsel generally would have given the Petitioner's file to appellate counsel; he maintained that he had "no idea" when another person would have had the opportunity to write on the file folder. Counsel noted that in his experience, the attorney

---

[7] The trial record, which was exhibited to the hearing, reflected that counsel did not ask Investigator Jinks about the statement; however, we note that no trial testimony indicated that Investigator Jinks was present for the conversation in which the statement occurred. Investigator Jinks testified at trial that she responded directly to the hospital, interviewed the victim, and had J.M. transported to the hospital by other officers in order to administer the photograph lineup.

[8] It appears that trial counsel and post-conviction counsel were referring to different recordings here. Post-conviction counsel asked if trial counsel did not review the police cruiser recording in which J.M. said that the victim had a gun; however, trial counsel's response refers to the photograph lineup, which was only addressed in J.M.'s police interview with Investigator Jinks.

who represented the Petitioner on appeal did not generally "do that work," referring to investigating defense theories; he denied that appellate counsel requested the Petitioner's file in writing.

Trial counsel testified that he did not recall any specific conversation with the Petitioner about his testifying, although he was certain it occurred. The Petitioner did not ultimately testify at trial. Counsel stated that he customarily told defendants not to make a decision about testifying until the close of the State's proof.

On cross-examination, trial counsel testified that the Petitioner was charged with attempted first degree murder and was convicted of the lesser-included offense of attempted second degree murder. Counsel agreed that the State's discovery response included the Petitioner's recorded police statement, photographs, the police cruiser recording, and the recorded interviews with J.M. and the victim. Counsel stated that the Petitioner denied shooting the victim or being present during the shooting in his police interview, although the Petitioner could not provide an alibi due to the passage of three months between the dates of the shooting and the interview.

The State played several portions of J.M.'s recorded interview and asked counsel if J.M. stated to police, "That's the gun that y'all found? Y'all found his gun?" Some confusion ensued about what the recording reflected, but counsel ultimately testified that the speaker in the recording referred to J.M.'s "being charged with a gun, that he had apparently pointed a gun at somebody a few days before that." Counsel agreed that J.M. never described the shooting as "some type of mutual combat" or said that the victim pointed a gun at the Petitioner.

Trial counsel maintained that based upon his review of the discovery materials and his conversations with the Petitioner, he had no indication that the Petitioner acted in self-defense. Counsel stated that the defense theory attempted to shift blame to a man with dreadlocks, who was mentioned by both the victim and J.M. in their respective police interviews, and casting doubt on the version of events advanced by the State. Counsel agreed that he also attacked the State's investigation and delay in charging the Petitioner in order to imply that the conduct was not as serious as the State portrayed it.

Trial counsel denied that the Petitioner ever expressed a desire to testify in order to claim self-defense. Counsel noted that the Petitioner told him "early on" that he would not testify. Counsel agreed that he would have discussed with the Petitioner that if the Petitioner testified, his police statement could be used as impeachment evidence. Counsel stated that at the time of trial, the victim was in custody in connection with another case and represented by his own counsel. J.M. was brought to court by his mother.

On redirect examination, trial counsel agreed that the motion for a new trial was argued in September of 2014 and that the notice of appeal was filed in November of 2014. Counsel identified two January 2015 letters from post-conviction counsel's office requesting the Petitioner's physical file. Counsel did not recall, however, whether he provided the file to post-conviction counsel directly or how the file was transferred. Counsel agreed that in the police cruiser recording, J.M. excitedly repeated, "My brother had his gun on him." Counsel said that during J.M.'s excited statements, a gun fell out of J.M.'s clothing in front of an officer.

The Petitioner testified that he and trial counsel "[b]riefly" discussed the evidence during counsel's "[m]aybe four" visits. The Petitioner stated that he asked counsel to interview multiple witnesses, including the victim, "Dejahnette Smith," and "Omari Bill." The Petitioner said that relative to interviewing the victim, counsel claimed it "wouldn't do no [sic] good." The Petitioner stated that during his first meeting with counsel, he asked counsel to hire a private investigator and that counsel responded, "My office . . . doesn't offer that." The Petitioner denied that counsel ever played the police cruiser recording for him, although he affirmed that counsel played the victim's recorded police interview during one meeting.

The Petitioner testified that the first time he met counsel, he discussed pursuing a self-defense theory and that counsel presented the State's plea offer. The Petitioner explained that he was initially afraid to tell counsel the truth, but that after counsel "kept coming, trying to get [the Petitioner] to take a deal," he decided to tell counsel that the victim "pulled a gun out on [the Petitioner]" and this was the reason the Petitioner shot him. The post-conviction court questioned the Petitioner and asked him to clarify whether he raised self-defense with counsel at their first meeting or later; the Petitioner responded as follows:

> See, the first time [counsel] met with me, . . . he didn't bring anything with him.
>
> . . . .
>
> So I told him the first time, you know, look up some things for me on mutual combat and self-defense. So that's where it came into play where he wrote it down in his notes and wrote it down. So the next time, that's when he brought the computer and the discs and stuff, and then he came and told me about the same offer that he brought to me the first time. So after . . . the second time . . . I told him the reason I shot [the victim] was because he pulled a gun out on me.

The Petitioner testified that on the day of the shooting, he left his cousin's residence and was walking down a staircase when he saw someone pass by him. The Petitioner did not believe the person he passed knew him because no greetings were exchanged. At the bottom of the stairs, he turned right and was preparing to walk through a "tunnel" when he saw the victim walking toward him from the other side of the tunnel. The Petitioner asserted that the victim had a "gun on his side" and that when the two men made eye contact, the victim pointed the gun at him. The Petitioner stated that he was carrying a gun in the pocket of his hooded sweatshirt and that he shot his gun at the victim from inside his pocket until the victim dropped his gun, and then the Petitioner ran away. The Petitioner affirmed that other people were present and that one of the victim's friends could have picked up the gun.

The Petitioner testified that he relayed this version of events to trial counsel but that they never discussed it further and that counsel "never dug into anything that [the Petitioner] gave him." The Petitioner explained that when counsel visited him, he never brought "anything that he had looked up or anything." The Petitioner stated that he had no faith in counsel and that he did not feel he "had a chance." The Petitioner noted that counsel presented the same plea offer at every visit. The Petitioner stated that he rejected the offer because counsel "didn't look into" anything before reviewing the State's evidence against the Petitioner. The Petitioner felt that counsel was not working on his behalf.

The Petitioner testified that he saw counsel write down the words "self-defense and mutual combat" in his notes. The Petitioner stated that during a recess at trial, he and counsel discussed a third party's possibly testifying on the Petitioner's behalf. The Petitioner said that during this conversation, the Petitioner addressed whether he would testify. The Petitioner said that he told counsel, "[Y]ou haven't even presented anything about self-defense on my behalf. So . . . I really don't know. I don't think it's in my best interest to testify." The Petitioner said that counsel never explained why he did not raise self-defense. The Petitioner agreed that counsel challenged the witness identifications and photograph lineups and that "the light-skinned person with dreadlocks was floated out" as a possible alternative perpetrator. The Petitioner averred that had counsel interviewed the witnesses, they could have corroborated that the victim had a gun or been able to determine where the victim's gun was taken after the shooting. The Petitioner said that counsel never explained why he did not interview the witnesses, stating that every time the topic came up, counsel "rolled it off." The Petitioner opined that counsel "didn't want to do it."

The Petitioner stated that during his confinement, he had received an affidavit from the victim. The Petitioner denied speaking to the victim in prison or having solicited the affidavit from him. When asked why the victim would decide after years to come forward with a "truthful version" of events, the Petitioner speculated that the victim wanted to "make it right." The Petitioner noted that he was in prison because the victim lied, that the

-10-

victim was also incarcerated, and that in prison "you can't do nothing [sic] but sit down and think."

On cross-examination, the Petitioner stated that at the time of counsel's first visit, neither of his cases had gone to trial, that they discussed the plea offer of fifteen years at thirty percent service, and that the Petitioner requested a printed copy of "the mutual combat and the self-defense thing." During the second visit, counsel did not bring the requested material, but instead brought the discovery materials on computer discs. They listened to the victim's interview and again discussed the plea offer; it was at this point, the Petitioner claimed, that he told counsel that he acted in self-defense. The Petitioner stated that counsel showed him a copy of the transcribed 911 calls and that he "heard something" recorded regarding J.M., although it was not the recording admitted at the post-conviction hearing. The Petitioner denied that they reviewed his recorded police interview or the firearms examiner's report; he recalled reviewing the crime scene photographs. The Petitioner stated that the third meeting was brief and that he asked counsel for the printed information he had requested; he said that counsel claimed to be "working on it." The Petitioner noted that neither he nor his family members were able to reach counsel by telephone and that the Petitioner "gave up" at this point.

The Petitioner denied asking Mr. Lomonaco for the information he sought from trial counsel. He noted that he did not believe Mr. Lomonaco could "do anything about it" and that both trial counsel and Mr. Lomonaco "always said . . . with those two cases, . . . they [had] nothing to do with each other." The Petitioner did not recall whether his recorded police interview was played for the jury at trial.

The Petitioner's June 15, 2016 audio-recorded police interview was entered as an exhibit and reflected that when the Petitioner was asked about the March 30, 2016 shooting, he commented that it had "been a few months" and that he did not remember where he was that day. After Investigator Jinks relayed a version of events consistent with the victim's later trial testimony, the Petitioner denied having shot anyone. After being told the victim's identity, the Petitioner again denied having shot "that boy"; the Petitioner characterized the victim as "a child" and commented that he had watched the victim grow up in their neighborhood and had no reason to harm him. Investigator Jinks specifically asked if the victim had done "something" to the Petitioner or whether a "battle" had occurred, both of which he denied. Investigator Jinks noted that she knew the Petitioner was affiliated with a "Bloods" gang, and she asked if the shooting was gang-related or arose out of the victim's disrespecting the Petitioner. The Petitioner stated that he understood Investigator Jinks's position given that he could not provide an alibi; however, he maintained that he did not shoot the victim and that the situation described by the victim never occurred.

The Petitioner affirmed that in his police interview, he denied having committed the shooting or having a conflict with the victim. When asked why he lied to Investigator

Jinks, the Petitioner stated that he was afraid and that he had "never been through this before[.]" The Petitioner acknowledged, though, that at the time of his police interview, he had already admitted to police that he participated in a shooting at Austin East High School; in the police interview regarding Austin East, the Petitioner averred that he acted in self-defense. When asked why he did not also articulate a self-defense claim relative to the victim's shooting, the Petitioner responded that the situation was different because at Austin East, more than one person was shooting; conversely, the victim had only pointed a gun at the Petitioner. The Petitioner stated that when Investigator Jinks interviewed him, he "didn't want anything to happen before [he] was brought up on charges for this," that he did not know how "the system worked," and that he did not want to get into more trouble "than what [he] was already in." The Petitioner acknowledged that after his arrest, he did not immediately tell anyone he acted in self-defense; he noted that he did not know how to contact Investigator Jinks and that his mother already knew his version of events. He commented that he thought it was counsel's role to convey his self-defense claim.

The Petitioner testified that in May 2018, he received the victim's affidavit. He maintained that he had not asked the victim to write the affidavit, in spite of its purporting to be on the Petitioner's behalf. The Petitioner affirmed that in the affidavit, the victim did not admit to possessing a gun or pointing it at the Petitioner. When asked whether he told trial counsel how he would handle questions on cross-examination regarding his changing statements, the Petitioner said that counsel never asked him about it and that the Petitioner did not worry because he "felt like the truth would come out anyways." The Petitioner noted that he never considered his credibility in front of the jury because counsel "never pursued it" and that the Petitioner "didn't have a fighting chance from the jump."

The victim testified that on March 30, 2013, he "upped a gun on" the Petitioner and pointed it at his chest; J.M. said, "Y'all tripping," causing the victim to look backward toward J.M.; and the Petitioner shot the victim in the leg. The victim stated that he dropped his gun when he hit the ground and that he gave his "girl" the gun before the police arrived. The victim stated that he did not see the Petitioner's gun when he pointed his gun at the Petitioner. The victim later said, though, that the shape of a gun was visible in the Petitioner's pocket. He agreed that the Petitioner pulled out his gun to defend himself. Relative to the impetus for the incident, the victim stated that the Petitioner and the victim's brother had a conflict; as a result, the victim was trying to scare the Petitioner. The victim acknowledged that he omitted any mention of his gun from his trial testimony, and he stated that he was not forthcoming with the trial court, the police, and his attorney in another case because he did not want to get into trouble. The victim noted that the prosecutor never explicitly asked if he had a gun, and he characterized his previous testimony under oath as not technically untrue.

The victim testified that he authored a notarized affidavit on May 18, 2018, and sent it to the Petitioner on his own initiative. He denied that anyone asked him to write it. The

victim stated that he wrote it because the Petitioner was only defending himself and that as the victim had gotten older, he realized what he did was wrong.

The notarized typed affidavit was received as an exhibit and read as follows:

> To Whom It May Concern:
>
> This is the affidavit of [the victim].
>
> Hey my name is [the victim] and I'm writing the court on the behalf of [the Petitioner]. I was on drugs at the time of [the Petitioner's] case, plus I was already in trouble so I thought by lying on [the Petitioner] would get me out of trouble but it didn't, so as I got older I learn right from wrong. I don't think [the Petitioner] should 0pay [sic] for something he didn't do. Therefore, I am writing the court on [the Petitioner's] behalf in order to ask that the court have mercy on this individual. Also, I would like the court to let [the Petitioner's] family know that I am truly sorry for everything I did. I did not mean to take they child away for something he didn't do, I was just young and scared of prison. I am truly sorry for that and I hope one day he and his family will forgive me. I hope my writing this letter will help begin to right my wrong.

The victim stated that he obtained the Petitioner's inmate identification number from a friend, "Lapolly," who was the Petitioner's "charge partner." The victim stated that he was formerly a member of a Bloods street gang, as were the Petitioner and Lapolly. Although the victim agreed with the general statement that gang members were not supposed to identify their peers as having committed crimes against one another, he noted that different types of Bloods gangs existed and that a person could not claim to be friendly with another person merely because both people were members of gangs falling under the general Bloods category.

The victim testified that he did not feel a need to include his brandishing a gun at the Petitioner in the affidavit "because they [were] going to pull" the victim to court "to say it." After the victim mailed the affidavit, post-conviction counsel contacted him, and the victim conveyed to post-conviction counsel that he had brandished a gun before the shooting and that he was willing to testify at the post-conviction hearing.

An audio recording of Investigator Jinks's interview with the victim was played. In the recording, the victim stated that the Petitioner shot him because the Petitioner thought the victim had made a comment regarding the Petitioner's not being in a Bloods gang. The victim asked why J.M. had been arrested, and Investigator Jinks responded that J.M. had been caught with a gun and that "while he was throwing a fit," a gun "fell out." The victim

denied that the Petitioner said anything to him or articulated a reason for shooting him. The victim stated that before the shooting, he and J.M. encountered a light-skinned man with dreadlocks who told the two boys that they were not "proper," meaning gang-affiliated.[9] The victim stated that after the shooting, the Petitioner ran into an apartment. Investigator Jinks then showed the victim a photograph lineup, and the victim verbally indicated that he had chosen a photograph.

The victim testified that he told Investigator Jinks that he did not know why the Petitioner shot him. He maintained that he had no knowledge of J.M.'s carrying a gun on the day of the shooting. The victim admitted to being a member of the "Vice Lords" street gang and to having prior convictions for robbery and possession with intent to sell heroin and cocaine. Upon examination by the post-conviction court, the victim testified that before he went to prison, he carried a silver, .9 mm P95 Ruger handgun that he had bought "off the street."

The post-conviction court denied both the petition for post-conviction relief and the petition for writ of error coram nobis by written order filed September 3, 2019.[10] The court found that trial counsel prepared for trial by obtaining and reviewing the discovery materials, interviewing the Petitioner, and reviewing the State's evidence with the Petitioner multiple times and discussing defense strategy. The court noted that multiple recorded witness statements were included in discovery and that counsel looked for the witnesses in the court computer system. The court credited counsel's testimony regarding the uncertain origin of the handwritten notes in his file referring to self-defense; the court noted that the cursive handwriting "appear[ed] to be done by a different hand." The court found that the Petitioner rejected the State's plea offer and that counsel chose a defense strategy of casting doubt on the Petitioner's identity as the shooter or, alternatively, asserting that the shooting did not constitute attempted first degree murder.

The post-conviction court credited trial counsel's testimony and discredited the Petitioner's testimony regarding whether the Petitioner told counsel about the victim's brandishing a gun. The court found that the Petitioner denied being present during the shooting in his police interview and that no evidence indicated that the Petitioner told police, trial counsel, or anyone else that he acted in self-defense. The court concluded that counsel "reasonably developed the defense strategy in accordance with this information." The court specifically credited counsel's statement that if the Petitioner had told him that the victim had a gun, counsel would have considered a self-defense claim.

---

[9] The audio of this portion of the interview was not clear enough to determine the full meaning of the conversation.

[10] On September 5, 2019, the post-conviction court entered a corrected order containing a case number that had been handwritten on the original order. The substance of the orders were identical.

Relative to the gun found at the crime scene, the post-conviction court found that although J.M. told the police that the victim had been carrying a gun, J.M. later admitted that the gun was his and that he had lied because he was afraid of getting into trouble. The court noted that a police officer saw the gun fall out of J.M.'s clothing.

Relative to the victim's recantation of his trial testimony, the post-conviction court found that he was not credible, noting that the victim was a convicted felon and gang member who had a "lengthy criminal history." The court made the following findings regarding the affidavit:

> [T]he court finds it difficult to believe that a criminal defendant who, without prompting, wanted to tell the truth and apologize to a wrongfully convicted defendant, would do that in the form of an affidavit sent to the [Petitioner]. Why say, "To Whom It May Concern"? A letter to the [Petitioner] would address it to him. Why do this in the form of an affidavit? It makes much more sense that a person would send a letter first and then prepare an affidavit if requested. Furthermore, the affidavit is typed. Why would [the victim] do this if he was just sending a letter on his own? There is no explanation how [the victim] came to use a typewriter while in prison. Finally, the letter never says that [the victim] had a gun. Why wouldn't [the victim] admit to that in the letter? After hearing [the victim's] testimony on this matter and observing his demeanor, the court finds him to be wholly unbelievable.

Relative to trial counsel's investigation, the post-conviction court found that his performance was deficient, noting that although "seemingly" little would have been gained by conducting independent witness interviews in light of the defense theory, no evidence established that the witnesses were unavailable. The court felt constrained to conclude that "[w]ithout further explanation for the failure to at least attempt interviews," counsel was deficient in this regard. However, the court concluded that the Petitioner had not proven prejudice, finding that no evidence indicated that counsel would have obtained different information in a more thorough investigation that would have impacted the verdict. The court noted that the only testimony offered was that of the victim, whom the court had discredited, and that by the victim's own account, his change of heart did not occur until he had been in prison for some years after the trial.

Relative to trial counsel's failure to develop a self-defense theory, the post-conviction court found that counsel and the Petitioner presented conflicting testimony regarding the Petitioner's having conveyed to counsel that the victim pointed a gun at him. The court again credited counsel and discredited the Petitioner. The court found that none of the witness statements indicated that the victim had a gun other than J.M.'s statement to police, which the court noted was not credible and had been "quickly" recanted. The court

noted that in addition to J.M.'s recanting his statement and admitting the gun was his, a police officer had seen the gun fall out of J.M.'s clothing.

The post-conviction court concluded that based upon the available information, counsel's decision to pursue identity or, alternatively, the absence of an intent to kill as the defense strategy was sound. The court concluded that counsel was not deficient in this regard. Moreover, the court concluded that the Petitioner suffered no prejudice, finding that no explanation had been given "as to how the jury could possibly believe" the Petitioner's proffered testimony regarding self-defense or how any other piece of evidence would have affected the outcome of the trial. The court noted that the defense strategy was not wholly unsuccessful and that the Petitioner was ultimately convicted of a lesser-included offense. The court further noted that if the Petitioner had testified and admitted to shooting the victim, which was inconsistent with his police statement, the jury might have convicted him as charged.

Relative to the petition for writ of error coram nobis, the post-conviction court found that "for purposes of argument," it considered the victim's hearing testimony as newly discovered evidence that was "therefore, timely." The court repeated its finding that the victim's testimony was not credible, noting that the victim's trial testimony was supported by the other witnesses and circumstantial evidence and that before the post-conviction hearing, the Petitioner had not conveyed to "anyone in authority" that the victim had pointed a gun at him. The court concluded that because it was not "reasonably satisfied that the trial testimony was false and the new testimony [was] true," the Petitioner was not entitled to a new trial. The Petitioner timely appealed the denial of both petitions.

ANALYSIS

*I.      Factual Findings*

The Petitioner contends that several of the post-conviction court's factual findings went against the preponderance of the evidence, particularly its credibility determinations. For the sake of efficiency, we will review these findings first in order to facilitate our review of the post-conviction court's application of the facts to the legal issues raised in the post-conviction and coram nobis petitions.

Firstly, the Petitioner argues that the post-conviction court erred by finding that the Petitioner was not credible, specifically in regard to his assertions that he told trial counsel to research self-defense and that the victim pointed a gun at him. In support of his argument, the Petitioner notes that his testimony was corroborated by the notes in trial counsel's file regarding self-defense and the need to obtain an affidavit from the victim; the victim's post-conviction testimony that he pointed a gun at the Petitioner; and J.M.'s

statement in the police cruiser recording that his brother had a gun. Secondly, the Petitioner argues that even if the court disregarded the Petitioner's testimony, the court erred by crediting counsel's assertion that the Petitioner never informed him of facts indicating self-defense, again citing the above-referenced corroborating evidence. Thirdly, the Petitioner argues that the court erred by discrediting the victim's hearing testimony, specifically its consideration of the victim's gang affiliation and felon status and its questioning how the victim accessed a typewriter in prison; the Petitioner similarly cites the corroborating evidence as indicative of the victim's credibility. Finally, the Petitioner asserts that J.M.'s statement in the police recording that his brother had a gun should have been given more weight and that the court erred when it found that J.M. "quickly recanted" the statement, which was not reflected in the recording.

On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id.

Relative to the handwritten notes in trial counsel's physical file, it is readily apparent that the notes referring to self-defense and mutual combat, as well as those naming additional witnesses, were written by a different person than the one who wrote the notes counsel identified as his own. Counsel did not know who wrote the notes or who would have had opportunity to do such, and he did not recall whether his file was first given to appellate counsel or to post-conviction counsel.

We note that in the Petitioner's appellate brief, post-conviction counsel correctly states that although trial counsel did not recall the precise day or year that appellate counsel received his file, the technical record reflects that appellate counsel was appointed on October 29, 2015, the same day the motion for a new trial was denied. In an attempt to clarify who had access to trial counsel's file before post-conviction counsel received it, post-conviction counsel discusses his January 2015 letter requesting the file. Post-conviction counsel then proceeds to aver, apparently from his own recollection, that trial counsel gave him the file before the motion for new trial hearing. We note that post-conviction counsel unsuccessfully attempted to elicit this information from trial counsel at the post-conviction hearing.

Post-conviction counsel did not testify at the post-conviction hearing or call another witness who could establish when post-conviction counsel received the file and whether appellate counsel had access to the file prior to that time. This court is not permitted to consider facts outside of "those facts established by the evidence" in the lower court, especially those which are relevant to the merits of the issues on appeal and are disputed. Tenn. R. App. P. 13(c); see Tenn. R. App. P. 14, Advisory Comm'n Cmts. ("Although the

appellate court should generally consider only those facts established at trial, it occasionally is necessary for the appellate court to be advised of matters arising after judgment. These facts, unrelated to the merits and not genuinely disputed, are necessary to keep the record up to date.")

In short, no evidence established the identity of the person who wrote in cursive in the Petitioner's file, only that trial counsel was excluded as the source. The evidence does not preponderate against the post-conviction court's finding that counsel did not write the notes. The only relevant notes that trial counsel acknowledged having written referred to investigating the victim and possibly obtaining an affidavit from him, which did not make it more or less likely that counsel had been informed of the Petitioner's self-defense claim. Having found that the most salient notes to the self-defense issue were not written by trial counsel, the evidence does not preponderate against the post-conviction court's finding crediting counsel's testimony that the Petitioner never communicated facts to him supporting a self-defense theory.

Relative to the victim's credibility, the post-conviction court was in the best position to assess the victim's demeanor, his explanation of his decision to recant, and the veracity of his testimony. It is not apparent that the post-conviction court considered any improper facts in rendering its decision, which was based upon the victim's circumstances in prison and the court's impression of the victim during the hearing.[11]

Similarly, the Petitioner's argument relative to his own credibility fails because the evidence he claims corroborates his hearing testimony—the notes in trial counsel's file and the victim's hearing testimony—was properly determined to be incredible. The record does not reflect that the evidence preponderates against the post-conviction court's finding discrediting the Petitioner's testimony.

Finally, although the Petitioner takes issue with the post-conviction court's characterization of J.M.'s recanting his statement that the victim had a gun as "quick," the record reflects that a short time after the conversation documented in the police cruiser recording, J.M. spoke to Investigator Jinks and admitted that the .25-caliber handgun was his. In addition, the Petitioner urges this court to conclude that the only reasonable interpretation of J.M.'s first stating that the victim had a gun, then later choosing not to mention it, resulted from J.M.'s realizing that the victim would get into trouble for having a gun. However, when taken in the context of the entire recording, another interpretation was equally plausible. In the first recording, J.M. stated that the victim had a gun, that he

---

[11] We note that near the end of his testimony, the victim did state that he had the affidavit "typed up" in the prison library. Nevertheless, the court's comment regarding a typewriter occurred in the context of the court's discussion of the generally inconsistent characteristics of the affidavit as a whole as compared to the victim's explanation of his motivation in drafting it.

was being truthful and straightforward with the officers, and that the jacket J.M. had been wearing was not J.M.'s. The post-conviction court reasonably interpreted J.M.'s first statement an attempt to shift blame from himself because he had just been caught carrying a gun, rather than a truthful disclosure that the victim had a gun.

In sum, the post-conviction court's factual findings were supported by the record and did not constitute an abuse of discretion. Therefore, we will not disturb the court's findings as we review the legal issues raised on appeal.

## II.     *Post-Conviction Petition*

Relative to the post-conviction petition, the Petitioner contends that he received the ineffective assistance of trial counsel because counsel failed to investigate and pursue a theory of self-defense. The State responds that the post-conviction court properly determined that counsel did not render ineffective assistance in this regard.

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger v. State, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. In reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

Prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger, 279 S.W.3d at 293-94 (Tenn. 2009). As stated above, on appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields, 40 S.W.3d at 456. Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

*a. Investigation*

The Petitioner contends that trial counsel rendered ineffective assistance by failing to investigate facts supporting self-defense. At oral argument, post-conviction counsel asserted that although it was the Petitioner's position that he informed trial counsel of the victim's having pointed a gun at him, any competent attorney would have pursued a self-defense argument after hearing J.M.'s statement on the police cruiser recording that the victim had been carrying a gun. Post-conviction counsel's implication was that trial counsel had not reviewed the police cruiser recording. The State responds that the post-conviction court discredited the Petitioner's testimony that he informed counsel of having acted in self-defense and that even if counsel had interviewed the victim, the victim likely would not have provided different information than what was contained in his police statement because by the victim's own admission, he only decided to recant his trial testimony after having had a change of heart some years after the Petitioner's trial.

Although trial counsel does not have an absolute duty to investigate particular facts or a certain line of defense, counsel does have a duty to make a reasonable investigation or to make a reasonable decision that makes a particular investigation unnecessary. Strickland, 466 U.S. at 691. Counsel is not required to interview every conceivable witness. See Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995). Furthermore,

no particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel. Rather, courts must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and judicial scrutiny of counsel's performance must be highly deferential.

Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (internal citations and quotations omitted).

A reasonable investigation does not require counsel to "leave no stone unturned." Perry Anthony Cribbs v. State, No. W2006-01381-CCA-R3-PD, 2009 WL 1905454, at *49 (Tenn. Crim. App. July 1, 2009). Rather, "[r]easonableness should be guided by the circumstances of the case, including information provided by the defendant, conversations with the defendant, and consideration of readily available resources." Id. The United States Supreme Court has said, "[I]nquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions." Strickland, 466 U.S. at 691.

The post-conviction court explicitly discredited the Petitioner's assertion that he informed trial counsel of the facts supporting self-defense; in particular, the court noted the uncertain origin of the written notes in counsel's file referencing self-defense. The court found counsel's assertion that the Petitioner never discussed self-defense and maintained his innocence to be credible. The court noted that counsel's testimony was consistent with the Petitioner's police statement. The court found, though, that counsel was generally deficient during his investigation because he did not attempt to interview any witnesses.

Relative to the Petitioner's contention that counsel was deficient because he failed to discover J.M.'s recorded statement that the victim had a gun, we note that the record does not support the Petitioner's allegation that counsel failed to review the police cruiser recording. Counsel testified that he reviewed the recordings and discussed J.M.'s statement. Counsel's remarks indicated that he did not interpret J.M.'s statement as truthful in light of the absence of a second gun at the crime scene and J.M.'s later admission that the .25-caliber handgun was his. Counsel acknowledged that he could have cross-examined J.M. regarding the recording but did not do so, and he did not recall the reasoning behind that decision. Although the post-conviction court did not explicitly address J.M.'s recorded statements in its order, it found that counsel was deficient for failing to interview any of the witnesses. We conclude that counsel was also deficient for failing to cross-examine J.M. regarding J.M.'s recorded statement that the victim had a gun; we note that witness credibility in this case was critical and that even though self-defense was not the defense strategy at trial, the statement could have been used for purposes of impeachment.

Nevertheless, the post-conviction court concluded that no prejudice resulted to the Petitioner as a result of deficiencies in counsel's investigation because even if counsel had interviewed the victim, there was no indication that the victim would have testified about pointing a gun at the Petitioner. We agree with the post-conviction court—the victim testified that he did not experience the change of heart leading him to recant his trial testimony until he had been in prison for some years. Further, the Petitioner did not present any other witness or evidence that additional investigation would have revealed. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Because the Petitioner failed to prove that a more thorough investigation would have produced evidence that likely would have influenced the verdict, he is not entitled to relief on this basis.

*b. Defense Theory*

The Petitioner contends that trial counsel rendered ineffective assistance by failing to raise self-defense at trial. The State responds that counsel pursued a reasonable theory of defense and that no prejudice resulted.

At the post-conviction hearing, trial counsel testified that based upon his conversations with the Petitioner and the Petitioner's police interview, he decided to pursue a theory of mistaken identity or, alternatively, that the Petitioner did not intend to kill the victim. The Petitioner maintained in the recorded police interview that he was not the shooter and that he had no conflict with the victim. Counsel testified that the Petitioner never told him that the victim pointed a gun at him and that the Petitioner initially denied involvement in the offense. Later, the Petitioner told counsel that the victim would not testify, which counsel dismissed as an unwise strategy, and that the State could not prove that the Petitioner intended to kill the victim because the victim was only shot in the leg. Counsel used the latter statement as a starting point for the alternative defense theory. As stated above, the post-conviction court credited counsel's testimony and discredited the Petitioner's testimony, finding that the Petitioner had not disclosed he acted in self-defense to anyone prior to the post-conviction proceedings. Counsel was not deficient for failing to pursue a defense theory that was not raised by his conversations with the Petitioner or any of the discovery materials. Cf. Wiley v. State, 183 S.W.3d 317, 332 (Tenn. 2006) (holding that trial counsel was deficient for failing to investigate and assert self-defense when the petitioner consistently told police and counsel that he and the victim argued, that the victim "rushed" him, and that he and the victim fell into a dresser).

Relative to prejudice, the Petitioner has not proven that a self-defense argument would have been supported by the evidence at trial or led to a different result. Notably, the Petitioner has not demonstrated that the victim or J.M. would have testified differently if they had been cross-examined about the victim's possessing a gun. The only evidence not presented at trial was J.M.'s recorded police cruiser statement, which could have been impeached by his later admission that the gun was his, and the Petitioner's testimony,

-22-

which could have been impeached by his police statement. The victim did not experience misgivings about his trial testimony or wish to rectify a wrong until years after the trial. We note that trial counsel's chosen strategy was not unsuccessful and that the Petitioner was convicted of a lesser-included offense. The Petitioner has not proven that he was prejudiced by counsel's failure to pursue a theory of self-defense at trial, and he is not entitled to relief on this basis.

## III.     Error Coram Nobis

The Petitioner contends relative to his coram nobis petition that the post-conviction court erred by discrediting the victim's revised testimony. The State responds that the petition was not timely filed and that the post-conviction court properly dismissed it.

A writ of error coram nobis is an extraordinary remedy available only under very narrow and limited circumstances. State v. Mixon, 983 S.W.2d 661, 666 (Tenn. 1999). A writ of error coram nobis lies "for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial." Tenn. Code Ann. § 40-26-105; see also State v. Hart, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995). The purpose of a writ of error coram nobis is to bring to the court's attention a previously unknown fact that, had it been known, may have resulted in a different judgment. State v. Vasques, 221 S.W.3d 514, 526-27 (Tenn. 2007).

The decision to grant or deny the writ rests within the discretion of the coram nobis court. Teague v. State, 772 S.W.2d 915, 921 (Tenn. Crim. App. 1988). "A court abuses its discretion when it applies an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence, or utilizes reasoning that results in an injustice to the complaining party." State v. Wilson, 367 S.W.3d 229, 235 (Tenn. 2012).

A petition for writ of error coram nobis must be filed within one year of the date the judgment of the trial court became final. See Tenn. Code Ann. §§ 27-7-103, 40-26-105; Mixon, 983 S.W.2d at 671. For coram nobis purposes, a trial court's judgment becomes final "either thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed, post-trial motion." Harris v. State, 301 S.W.3d 141, 144 (Tenn. 2010) (overruled on other grounds by Nunley v. State, 552 S.W.3d 800, 828 (Tenn. 2018)). A coram nobis petition "must show on its face that it is timely filed," and the State is no longer required to raise timeliness as an affirmative defense. Nunley, 552 S.W.3d at 828.

The one-year limitation period may be tolled only when required by due process concerns. See Workman v. State, 41 S.W.3d 100, 103 (Tenn. 2001). Courts must "balance the petitioner's interest in having a hearing with the interest of the State in preventing a claim that is stale and groundless" in determining whether due process tolls the statute of limitations. Wilson, 367 S.W.3d at 234. To do so, courts perform the following steps:

(1) determine when the limitations period would normally have begun to run; (2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and (3) if the grounds are "later-arising," determine if, under the facts of the case a strict applications of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim.

Id. (quoting Sands v. State, 903 S.W.2d 297, 301 (Tenn. 1995)).

In this case, the trial court's order denying the Petitioner's motion for a new trial was entered on October 29, 2015; as a result, the error coram nobis limitations period expired on October 29, 2016. The Petitioner filed his petition for writ of error coram nobis on November 5, 2018, making it untimely. In the petition, the Petitioner requested due process tolling of the limitations period because the petition had been filed within one year of the victim's May 21, 2018 affidavit and an interview with post-conviction counsel on August 1, 2018, during which counsel averred that the victim informed him of having pointed a gun at the Petitioner.

At the post-conviction hearing, neither the Petitioner nor the State discussed the timeliness of the petition, and the post-conviction court noted in its order that it considered the victim's testimony as "timely." The State has raised timeliness in its appellate brief, but the issue was not discussed by either party at oral argument.

Given that due process tolling was requested in the petition, we interpret the post-conviction court's statement that the victim's hearing testimony was timely as a finding that the grounds for the petition were later-arising and that the Petitioner exercised due diligence in pursuing his coram nobis claim by filing the petition less than one year after discovering the new evidence. Cf. Nunley, 552 S.W.3d at 830-31 (concluding that due process tolling was not merited when no explanation was given for an eighteen-year filing delay after the judgment became final, which also reflected an almost two-year delay between the petitioner's being notified of the existence of new evidence and the petition's filing); Harris, 301 S.W.3d at 146 (concluding that due process tolling was not merited when the petitioner waited six years to assert a coram nobis claim relative to alibi evidence and twenty-one months relative to a third-party confession).

The Petitioner's sole issue on appeal relates to the victim's credibility at the hearing when taken in light of the other corroborating evidence presented. We note once more that credibility determinations are the province of the finder of fact and will not be disturbed on appeal. Moreover, as we concluded above, the corroborating evidence offered by the Petitioner was discredited by the post-conviction court, and our review of the record reflects that it does not preponderate against the court's findings. The Petitioner and the victim were not credible witnesses; the victim's explanation of the impetus motivating him to prepare the affidavit, which was clearly addressed to a court and made no specific reference to the victim's having threatened the Petitioner with a gun, was less than compelling; and the notes in trial counsel's file were of uncertain provenance. The post-conviction court did not abuse its discretion by finding that it was unsatisfied with the veracity of the victim's revised testimony. The Petitioner is not entitled to relief on this basis.

CONCLUSION

Based on the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____<br>D. KELLY THOMAS, JR., JUDGE